Receipt # 064357

ORIGINAL

FILED

JAN 3 1 2006

U.S. COURT OF FEDERAL CLAIMS

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

UNITED STATES FIDELITY &
GUARANTY COMPANY
11 Schilling Road
Hunt Valley, MD. 21031

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 06-77 C

## COMPLAINT

COMES NOW, Plaintiff United States Fidelity and Guaranty Company ("USF&G"), by counsel, and for its Complaint against United States of America alleges as follows:

## THE PARTIES

1. USF&G is a Maryland corporation that is generally engaged in the business of providing surety bonds in Maryland and throughout the country.

2. The Defendant is the United States of America (the "Government").

## JURISDICTION

3. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491 and the Contract Disputes Act 41 U.S.C. § 601, et seq.

4. On or about March 31, 2005, USF&G submitted a timely certified claim to the Government and requested a Contracting Officer's final decision concerning the claim in accordance with 41 U.S.C. § 601, et seq. and 48 C.F.R. §33.206.

5. On or about May 5, 2005, the Contracting Officer notified USF&G that a final decision concerning USF&G's claim would be issued on USF&G's claim by August 30, 2005.

6. On or about August 23, 2005, the Contracting Officer notified USF&G that the Government would not issue a final decision concerning USF&G's claim by August 30, 2005 and that a final decision would be issued by October 31, 2005.

7. On or about October 31, 2005 the Contracting Officer notified USF&G that the Government would not issue a final decision concerning USF&G's claim by October 31, 2005, and that a final decision would be issued by November 4, 2005.

8. On or about November 4, 2005, counsel for USF&G received a copy of the narrative portion of the Contracting Officer's final decision via email.

9. On or about November 7, 2005, counsel for USF&G received the Contracting Officer's complete final decision, with attachments and exhibits.

10. The Contracting Officer's final decision denied the relief sought by USF&G in its claim.

11. In accordance with 41 U.S.C. § 609, USF&G hereby files the instant action within twelve (12) months of its receipt of the Contracting Officer's final decision concerning USF&G's claim.

12. In addition to the claims submitted under 41 U.S.C. § 601 et seq., USF&G hereby submits related equitable claims against the Government under 28 U.S.C. § 1491.

## BACKGROUND

13. On or about June 16, 1998, CCI Construction Co., Inc. ("CCI"), a general contractor, entered into Contract No. 50-32KW-8-004 (the "Construction Contract") with the Government, acting through the United States Department of Agriculture, to construct additions and renovations to the National Plant Germplasm Quarantine Center in Beltsville, Maryland (the "Project").

14. The Construction Contract called for, among other things, the construction of a Biosafety Level 3 ("BSL-3") Greenhouse ("BSL-3 Greenhouse"), a BSL-3 Laboratory ("BSL-3 Laboratory") to be used for research and containment of agricultural pathogens, and a support building containing, among other things, mechanical and electrical utilities, offices, laboratories, quarantine greenhouses, and a BSL-3 bio-waste containment area ("Support Building"). The Construction Contract also called for the construction of screenhouses and exterior site work.

15. The Government provided designs and specifications that were required to be adhered to by the contractor in its construction of the Project

16. The Construction Contract incorporated standard FAR provisions, including a "Changes" provision.

17. On or about June 16, 1998, at CCI's request, USF&G issued a performance bond in the amount of $15,500,000 (the "Performance Bond") and payment bond in the amount of $7,750,000 (the "Payment Bond") in accordance with the Miller Act, 40 U.S.C. § 270 et seq.

18. The Performance Bond and the Payment Bond were received and accepted by the Government.

19. On or about February 22, 2000, CCI informed the Government that it was unable to continue its performance of the Construction Contract.

20. On or about March 10, 2000, Government terminated CCI's right to proceed under the Construction Contract.

21. On or about April 26, 2000, the Government and USF&G entered into a takeover agreement (the "Takeover Agreement") whereby USF&G agreed to retain a completion contractor to finish CCI's scope of work under the Construction Contract.

22. On or about April 26, 2000, USF&G entered into a contract with Alexander Constructors, Inc. ("Alexander") whereby Alexander would complete CCI's scope of work under the Construction Contract.

**The Government Failed To Perform Its Commissioning Obligations**

23. The Construction Contract required the Government to retain an independent "Commissioning Agent" to provide commissioning services throughout the construction of the Project.

24. As part of the commissioning services dictated by the Construction Contract, the Commissioning Agent was initially required to perform a thorough plan review of the BSL-3 design. The Commissioning Agent was then required to perform various commissioning activities as the work progressed to ensure that the facility construction, including the installation and integration of critical equipment and systems, was carried out properly and that performance parameters were met before subsequent phases of construction proceeded.

25. The Construction Contract identified nine discreet tasks to be performed by the Commissioning Agent. These tasks were identified in Section 15995, Part 1.1.C

of the Construction Contract as (1) "Plan Verification," (2) "Commissioning Plan Preparation," (3) "Submittal Review," (4) "Installation Verification," (5) "Start-Up Coordination and Verification," (6) "As-Built Drawing/Specification Coordination," (7) "Coordination of Owner Training," (8) "System Commissioning Final Report," and (9) "Post-Commissioning Procedures and Execution."

26. "Plan verification" was an essential element of the commissioning services that was supposed to subject the intricate BSL-3 mechanical design to a necessary peer review.

27. One of the other purposes of the commissioning services was to promptly detect any problems or shortcomings associated with the BSL-3 systems during the construction and installation process and thus avoid unnecessarily complicated final testing and minimize the need to interfere with or destroy subsequent construction to remedy any detected problems.

28. The Government contracted with Ellerbe Beckett, an architectural and engineering firm and the Project designer, to have Ellerbe Beckett perform full time Project site administration ("COR") services and the commissioning services required by the Construction Contract for the duration of Project construction.

29. Without notice to prospective bidders, due to Government budget considerations, the Government eliminated five of the nine major commissioning service tasks contemplated in the Construction Contract from its contract with Ellerbe Beckett. The eliminated commissioning service tasks were those contract obligations identified in Section 15995 of the Construction Contract as "Plan Verification," "Commissioning Plan

Preparation," "Installation Verification," "Coordination of Owner Training," and "Post-Commissioning Procedures and Execution."

30. In contravention of the Construction Contract's requirement that the USDA retain an independent commissioning agent, Ellerbe Beckett subcontracted the commissioning services to Olsson Associates ("Olsson" or "Commissioning Agent").

31. Neither the bid package nor the Construction Contract was modified to reduce the Government's commissioning service obligations. In addition, the Government failed to inform USF&G that it had no intention of fulfilling all of its commissioning service obligations under the Construction Contract.

32. The Government failed to properly deliver the limited commissioning services for which it did contract.

33. The Government failed to contract for the full range of commissioning services contemplated in the Construction Contract and instead contracted for a reduced amount of commissioning services.

34. As a result of the Government's failure to deliver the commissioning services promised by the Construction Contract the commissioning process was in many instances entirely omitted and in other instances performed haphazardly causing numerous delays and disruptions to the Project as well as increased costs for USF&G.

35. Because the Government failed to perform the requirements of Section 15995 of the Construction Contract identified as "Plan Verification," critical design and equipment deficiencies were not discovered until well after the work was complete and belated testing was performed.

36. Because the Government failed to properly perform the requirements of Section 15995 of the Construction Contract identified as "Commissioning Plan Preparation," the commissioning process was carried out in an unorganized and uncoordinated manner that disrupted and delayed ongoing construction activities.

37. Because the Government failed to properly perform the requirements of Section 15995 of the Construction Contract identified as "Submittal Review," numerous problems related to the performance requirements of equipment and materials were not identified in a timely fashion causing delays and disruptions.

38. The Government failed to properly perform the requirements of Section 15995 of the Construction Contract identified as "Installation Verification" and "Start-Up Coordination and Verification" which resulted in disjointed, unscheduled, and ad hoc testing and inspection of the BSL-3 construction, equipment and systems which caused numerous delays and costly rework.

**The Government's Failure to Conduct Required Commissioning Services Adversely Impacted the Commissioning of the Bio-Containment Barrier to USF&G's Detriment**

39. The Construction Contract required the construction of various walls, ceilings and floors in the BSL-3 areas that serve as a bio-containment barrier necessary to contain agricultural pathogens. The Construction Contract, particularly Section 15995 and Part 1, Section B, contemplated sequenced Commissioning Agent inspections to be carried out prior to any interior build-out construction in order to ensure the containment barrier's compliance with specifications as the construction progressed.

40. The Government's failure to properly perform the "Plan Verification" and "Commissioning Plan Preparation" had a particularly significant detrimental effect on the

construction of the bio-containment barrier. As a result of the Government's failure to properly implement these contractual requirements and other failures by the Government, the Commissioning Agent did not conduct the required testing and inspections at various stages of the bio-containment construction. Instead, the Government performed belated and unorganized system testing which was severely complicated by the fact that the framing and drywall installation in the BSL-3 Laboratory had already been completed.

41. The Government's failures to implement these contractual commissioning safeguards is particularly egregious because, while the bio-containment barrier was under construction, the Government was expressing concerns to Ellerbe Beckett about CCI's ability to satisfactorily complete the work.

42. The Government's contractual failures in coordinating and conducting the bio-containment barrier inspections led to protracted testing and overly complicated rework to correct deficiencies that should have been easily detected and fixed if testing was performed as the work progressed. In addition, because the bio-containment testing was performed in a haphazard manner, the testing delayed and disrupted other construction activities in the affected areas.

**The Government's Failure to Conduct Required Commissioning Services and Design Defects Adversely Impacted the Commissioning of the HVAC System to USF&G's Detriment**

43. The Government's failure to properly perform the "Plan Verification" and "Commissioning Plan Preparation" also had a significant detrimental effect on the installation and commissioning of the mechanical systems that allow the safe handling of pathogens through the control of air flow.

44. In the late summer of 2001, the Government established a temperature "setpoint" to be maintained by the HVAC system in the interior spaces of the BSL-3 Laboratory and BSL-3 Greenhouse.

45. USF&G attempted to comply with the Government's directive for over a year before the COR finally acknowledged that the system was not designed to achieve the temperature setpoint established by the Government.

46. USF&G expended significant time and expense attempting to commission the HVAC system to meet the Government's overly rigorous performance criteria and the Project was delayed for a protracted period of time.

47. After delay and cost were expended by USF&G in attempting to meet the overly rigorous performance criteria, the Government ultimately settled upon a less stringent interpretation of the corresponding contract specifications.

48. Had the Government properly performed the commissioning services as required by the Construction Contract, any performance limitation of the specified mechanical equipment and/or overly rigorous standards would have been detected before commissioning commenced.

49. The Construction Contract set forth certain requirements for maintaining negative air pressure in the BSL-3 areas to ensure contaminated air does not leak from the secured areas.

50. Numerous defects with the HVAC system design made it impossible to meet and/or maintain the air pressure performance requirements in the Construction Contract.

51. USF&G expended significant time and expense attempting to commission the HVAC system to meet the Construction Contract's performance criteria despite the design defects.

52. The design defects caused the Project to be delayed for a protracted period.

53. Had the Government performed a proper "Plan Verification" as required by the Construction Contract, the HVAC design defects should have been detected before commissioning commenced.

**USF&G Incurred Extra Costs as a Result**
**of the Government's Improper Inspections**

54. The design specifications in the Construction Contract required ductwork in the BSL-3 areas to have a maximum 3% leakage rate except in certain critical areas that were required to have a 0% leakage rate.

55. As a result of the Government's failure to conduct a proper "Plan Verification" as required by the Construction Contract, the COR misinterpreted the specifications and directed USF&G to install ductwork with a 0% leakage rate throughout the BSL-3 areas.

56. USF&G and its mechanical subcontractor incurred substantial additional costs and disruption in attempting to conform all the BSL-3 ductwork to the 0% leakage rate incorrectly required by the COR.

**USF&G Incurred Extra Costs as a Result of the Government's Failure to Conduct Contractually Mandated Inspections of the Dual Containment Piping System**

57. The Project called for the construction of an underground dual containment piping system to transport bio-waste materials from the BSL-3 areas to a bio-waste treatment room in the Support Building.

58. The Construction Contract, particularly Section 02718, required the Government to conduct testing and inspections of the dual containment piping system at various stages during the installation process.

59. The Government failed to conduct any of the inspections or testing required by the Construction Contract during the installation of the dual containment piping system.

60. The Government first tested the dual containment piping system approximately a year and a half after the piping system was installed.

61. The belated Government tests revealed a potential gravity flow problem in the piping system.

62. As a result of the Government's belated inspection, USF&G incurred substantial extra costs in demolishing the exterior work above the piping system, re-excavating, testing, reinstalling, and re-testing the piping system.

**USF&G Incurred Extra Costs as a Result of the Government's Failure to Conduct Contractually Mandated Inspections of the Sanitary Sewer System**

63. The Project called for the construction of a sanitary sewer system to transport ordinary waste materials from the Support Building.

64. As part of its commissioning obligation, the Government was required to monitor the installation and testing of the sanitary sewer system at various stages during the construction process.

65. The Government failed to properly commission, monitor, and inspect the installation of the sanitary sewer system.

66. The Government first tested the sanitary sewer system approximately two years after the sewer system was installed and after paving, curbing, landscaping and other exterior site-work had been completed above the sewer line.

67. The belated Government tests revealed a leakage in certain pipe joints and an insignificant slope deficiency in a portion of the piping.

68. As a result of the Government's failure to timely inspect the installation of the sanitary sewer line, USF&G incurred substantial extra costs in making repairs and ultimately reinstalling portions of the sanitary sewer system.

69. Had the Government carried out its contractual commissioning obligations during construction, the repairs to the sanitary sewer system would have been significantly less expensive, time consuming and complicated.

70. The Government, USF&G and Alexander agreed that the problems in the sanitary sewer system would be addressed by slip-lining the system.

71. USF&G and Alexander successfully installed the slip-lining at a substantial cost.

72. The Government continued to use the slip-lined sanitary sewer line for over a year without a significant incident.

73. Contrary to its agreed remedial method, in 2002, the Government directed that the previously identified slope deficiency be addressed through re-excavation and replacement of the pipe, rendering useless the entire slip-lining repair.

74. The Government unreasonably directed USF&G to replace the affected portion of sewer line despite the fact that the cost of correction was economically wasteful, unnecessary, and duplicative of the agreed upon repairs and the work in place was adequate for its intended purpose.

75. USF&G's effort to comply with the Government's direction was complicated by the Government's wrongful decision to prohibit USF&G from performing the requested rework on the sanitary sewer line pending the completion of repairs to the underground dual containment pipeline. The Government's refusal to allow USF&G to promptly address this rework caused delays and additional costs for USF&G.

**The Government Materially Altered USF&G's**
**Surety Obligations By Overpaying CCI**

76. At the time the Government terminated CCI, CCI had completed about half of the construction work while 85% percent of the contract period had elapsed.

77. Despite having a significant amount of remaining work, at the time CCI was terminated, the Government had already paid CCI for 100% of CCI's general conditions costs, or $775,000. CCI was only entitled to approximately 50% of its general conditions costs consistent with the amount of work it actually performed on the Project.

78. The Government also paid CCI for approximately 90% of the High Security Building Dry In work, although none of the work had yet been performed.

79. The Government failed to withhold appropriate retainage to protect USF&G's interests as completing surety given the project delays.

**The Government Materially Altered USF&G's**
**Surety Obligations By Failing to Timely Terminate CCI**

80. In November of 1999, CCI had completed only 46% of the work while 86% of the time had elapsed. On November 4, 1999, during a meeting with Ellerbe Beckett, the Government questioned CCI's ability to complete the work on time and CCI's ability to meet the quality requirements of the Construction Contract.

81. Although it was known by the Government that CCI could not complete the work in the remaining contract period and that CCI was having quality control difficulties, the Government abused its discretion by taking no action to terminate CCI until after CCI notified the Government of its inability to continue performance on February 22, 2004.

82. The Government has since claimed that significant work items performed by CCI in the intervening time between November 4, 1999 and February 22, 2004, were defective and necessitated rework by USF&G.

83. USF&G has suffered bond losses in the amount of $7,050,088 caused by the Government's acts and omissions.

84. All necessary Parties have been joined and all conditions precedent to the bringing of this action have been satisfied.

**COUNT I**
**(Impairment of Suretyship/Equitable Subrogation)**

85. The allegations contained in paragraphs 1 through 84 above are incorporated herein by reference.

86. The Government, as the Performance Bond obligee, had a duty to administer the Construction Contract during CCI's performance in a manner that would

not increase the risk undertaken by USF&G as surety when it originally issued the Performance Bond.

87. The Government, as Performance Bond obligee, breached its duties to USF&G as surety by its improper administration of the contract by deciding to provide greatly reduced commissioning services than those promised by its bid documents and Construction Contract.

88. The Government breached its contractual duties and its duties to USF&G as surety by its improper administration of the Construction Contract during CCI's performance, when it failed to properly perform its contractual obligation to provide all the commissioning services prescribed in the Construction Contract.

89. The Government breached its contractual duties and its duties to USF&G as surety by its improper administration of the Construction Contract during CCI's performance when it failed to properly perform its contractual obligations to conduct inspections on the underground dual containment piping system during installation of the system.

90. The Government breached its contractual duties and its duties to USF&G as surety by its improper administration of the Construction Contract during CCI's performance when it failed to properly perform its contractual obligations to conduct inspections on the sanitary sewer system during installation of the system.

91. The Government breached its contractual duties and its duties to USF&G as surety by its improper administration of the Construction Contract during CCI's performance when it overpaid CCI and failed to withhold retainage consistent with its contract obligations and the rights of USF&G.

92. The Government breached its contractual duties and its duties to USF&G when it paid CCI for particular construction work prior to meeting conditions precedent to payment including the testing and inspection of the particular construction work.

93. USF&G was entitled to rely on the Government's obligation to properly administer the contract and to withhold and retain appropriate contract funds as security during CCI's performance.

94. The Government breached its contractual duties and its duties to USF&G as surety by its improper administration of the Construction Contract during CCI's performance and its overpayment to CCI.

95. Each of the foregoing material breaches and failures to properly administer the Construction Contract materially and prejudicially increased USF&G's risk as the performance bond surety on the Project.

96. USF&G incurred substantial additional costs as a result of the foregoing Government breaches and failures to properly administer the Construction Contract.

97. USF&G has suffered bond losses in the amount of $7,050,088 caused by the Government's acts and omissions.

**COUNT II**
**(Impairment of Suretyship: Abuse of Discretion in Administering the Termination Process/Equitable Subrogation)**

98. The allegations contained in paragraphs 1 through 97 above are incorporated herein by reference.

99. The Government, as the Performance Bond obligee, had a duty to account for the interests of USF&G, as surety, in deciding whether to terminate CCI's right to proceed under the Construction Contract for default.

100. By November of 1999, the Government had notice that CCI was far behind the construction schedule and would not be able to complete the work within the Construction Contract's performance period. In addition, the Government had notice that CCI was having quality control problems that would further delay the Project Project.

101. The Government breached this duty and abused its discretion by failing to terminate CCI's right to proceed under the Construction Contract until March 10, 2000.

102. USF&G was entitled to rely on the Government to properly administer the contract and to exercise reasonable discretion in making a timely decision regarding CCI's ability to continue performance on the Project.

103. USF&G was prejudiced by the Government's failure to exercise reasonable discretion in delaying making its decision to terminate CCI's right to proceed under the Construction Contract, and USF&G incurred substantial additional costs as a result of the Government's actions.

104. USF&G has suffered bond losses in the amount of $7,050,088 caused by the Government's acts and omissions.

**COUNT III**
**(Breach of Contract)**

105. The allegations contained in paragraphs 1 through 104 above are incorporated herein by reference.

106. The Takeover Agreement between USF&G and the Government provided that USF&G was "entitled to all rights, title and interest of [CCI] in and to the [Construction Contract] in all respects as if [USF&G] were the original party to the [Construction Contract]."

107. The Government materially breached the Construction Contract by failing to properly implement the commissioning services required under Section 15995 of the Construction Contract resulting in a haphazard commissioning process that delayed and disrupted USF&G's progress.

108. The Government breached the Construction Contract by directing USF&G to install ductwork with a 0% leakage rate throughout the BSL-3 areas even though the Construction Contract only required a leakage rate of 3% in many of these same areas.

109. The Government breached the Construction Contract by directing USF&G to re-excavate and replace the functional slip-lined sanitary sewer system. The Government's directive to perform additional rework on the sanitary sewer system constituted an economic waste.

110. The Government has breached the contract by wrongly withholding the contract balance from USF&G in the approximate amount of $1,299,215 to offset alleged additional costs for which USF&G is not responsible.

111. The Government has breached the contract by improperly directing USF&G to perform, at no cost to the Government, work which the Government alleges was under warranty but, in fact, was work for which USF&G is entitled to be paid.

112. As a consequence of each of the Government's breaches of contract, USF&G's progress on the Project was delayed and disrupted and it incurred significant extra costs.

113. USF&G has suffered bond losses in the amount of $7,050,088 caused by the Government's acts and omissions.

**COUNT IV**
**(Breach of Warranty of Design)**

114. The allegations contained in paragraphs 1 through 107 above are incorporated herein by reference.

115. The Government impliedly warranted that its Project designs and specifications would be free of defects and would meet the Construction Contract's requirements.

116. The Government breached it warranty of design by providing defective design specifications for the HVAC system in the BSL-3 areas.

117. As a result of the Government's defective designs, USF&G incurred significant extra time and costs in attempting to achieve the Government's performance standards on the Project.

118. USF&G has suffered bond losses in the amount of $7,050,088 caused by the Government's acts and omissions.

WHEREFORE, Plaintiff United States Fidelity and Guaranty Company respectfully requests that judgment be entered in its favor against the Government in the total amount of $7,050,088, plus interest and costs and any other relief this Court deems appropriate.

DATED: January 31, 2006.

Respectfully submitted,

**UNITED STATES FIDELITY & GUARANTY COMPANY**

By Counsel: ______________________

Christopher J. Brasco (Va. Bar No. 31873)
WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102-5104
(703) 749-1000 (Telephone)
(703) 893-8039 (Facsimile)