IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED STATES FIDELITY & GUARANTY COMPANY, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-77C |
| THE UNITED STATES, | ) | (Judge Wheeler) |
| Defendant. | ) | |

DEFENDANT'S UNOPPOSED MOTION FOR A SCHEDULING CONFERENCE

Pursuant to RCFC 16(a), defendant, the United States, respectfully requests that the Court convene a hearing to discuss scheduling matters.

On January 23, 2007, the Court issued an order containing the following schedule:

1. Plaintiff's expert report is due on or before May 15, 2007.
2. Defendant's expert report is due on or before June 15, 2007.
3. All fact discovery shall be completed on or before October 30, 2007.

At this time, the United States does not seek to extend the deadline for fact discovery (October 30, 2007).

We do respectfully request that the Court convene a hearing to consider our request for an altered schedule for the production of expert reports and the conclusion of expert discovery. At the hearing, we will request that the deadline for the plaintiff's expert report be extended to 45 days after the completion of fact discovery (December 14, 2007), that the

deadline for the defendant's expert report be extended to 45 days after the preceding deadline (January 28, 2008), and that a new deadline for the completion of all expert discovery be set for February 28, 2008.

In support of our motion for a scheduling conference, we respectfully offer the following reasons for why it is often helpful for expert discovery to follow fact discovery, and the following reasons for why a change to the current discovery schedule is in the interests of justice and judicial economy.

## I. Advantages To Having Experts Review All Available Evidence Before Issuing An Expert Report

In our view, expert reports are hearsay, and such documents are not admissible to prove the truth of the matters asserted.[1] In contrast, expert opinion at trial (which is subject to cross examination) is admissible for certain purposes pursuant to Fed. R. Evid. 702.

Although expert reports are not admissible for the truth, they nonetheless often play an important role in the litigation.

As the Court knows, the expert reports provide the parties with fair warning about what to expect at trial, and so provide an opportunity for the parties to prepare for trial, and to

---

[1] In contrast, summary exhibits (admitted pursuant to Fed. R. Evid. 1006) relied upon by the expert as the factual predicate for her opinion are admissible. Such summary exhibits are sometimes presented in the expert report. See RCFC 26(a)(2)(B) (requiring disclosure of summary exhibits relied upon by the expert).

narrow the issues for trial by such means as filing motions in limine to exclude certain proposed testimony. See RCFC 26(a)(2)(B) (requiring disclosure regarding expert testimony to be presented at trial).

In addition, the expert reports often serve the informal purpose of promoting settlement of certain disputes. For example, a DCAA audit sometimes leads to agreement concerning certain aspects of the proof of damages to be offered.

All these important purposes are undermined if the expert reports are prepared and exchanged before the completion of fact discovery. Fact discovery may reveal new information relevant to the expert opinion. At trial, the expert is likely to present an opinion based, in part, upon the new information. However, if the expert discovey has concluded before the expert discovery, then the pretrial disclosure will not be complete. Similarly, the parties will be reluctant to settle disputes based upon preliminary expert opinions because they know that the expert conclusions may change when further information is gathered.

For these reasons, at the hearing, we will respectfully request that the schedule be altered so that expert discovery follows fact discovery.

II. The Progress Of Fact Discovery In This Case

In light of the disclosure requirements in the Court's rules, there is a substantial risk that expert testimony could be

limited at trial to the scope of the expert report (including, perhaps, summary exhibits) disclosed during discovery. This risk creates an extremely strong incentive to complete all relevant fact discovery some weeks before the final expert report is due.

In this case, the parties would be under strong pressure to complete all fact discovery relevant to schedule issues, damages issues, and air conditioning system design issues by the end of April.

In order to complete this huge portion of fact discovery by the end of April, the parties will be forced to conduct discovery in an inefficient and unreasonably expensive manner.

For example, it is likely that depositions would have to be conducted before all relevant documents are collected and reviewed. Indeed, deponents may need to be selected before a full evaluation of what deponents are important to the case can be completed.

For another example, there would be heavy pressure to serve interrogatories and requests for admissions immediately. In contrast, the usual practice of counsel for the United States is to seek to limit his use of interrogatories, to narrowly target both the interrogatories and the requests for admissions served, and to serve such discovery slowly, over time, as the key factual disputes become more apparent. However, in order to have answers available for our expert, such discovery would need to be served

no later than March, 2007.[2]

If the United States is forced to complete all written discovery and depositions relevant to schedule, damages and air conditioning design issues before the end of April 2007, then the likely result will be more expensive and less effective for the parties than would otherwise be the case. To be blunt, the parties are not yet ready for such discovery.

The burden on the Court is also likely to increase because the parties are likely to be less successful in narrowing issues before trial.

We respectfully offer the following comparison of the usual course of discovery efforts, and the likely course of discovery in this case if all depositions and written discovery related to schedule, damages and air conditioning design issues in this case must be completed by the end of April. We also offer a brief description of discovery efforts to date.

A. <u>The Usual Course Of Discovery</u>

Discovery in a contract case typically proceeds in stages.

At the earliest stage, documents are gathered, copied, and exchanged.

Subsequently, the documents are reviewed and evaluated. In a construction contract case, a non-testifying expert often

---

[2] It is prudent to anticipate that more than 30 days will pass before a full response will be served by the opposing party.

assists with the document review if the volume of documents is large – as it is in this case.

Initial deponents are selected based upon the document review. Subsequent deponents are based upon the document review and the results of the early depositions.

It is the practice of counsel for the United States to confirm important deposition testimony with requests for admissions.

As the key factual issues come into focus during document review and depositions, it is the practice of counsel for the United States to send narrowly tailored interrogatories.

B. The Consequences Of An Early Expert Deadline

In this case, the parties are still at the document production stage. Indeed, it seems likely that document production will not be completed before the end of March.

Document review has recently begun (in response to the large volume of documents exchanged by the parties in January), but it is unlikely that the document review will be substantially completed before the end of April.

In accordance with the usual practice of counsel for the United States, no deposition would be scheduled before May. Furthermore, to accommodate the deposition requests by the plaintiff, and to accommodate the competing demands to perform work on many other cases, the usual practice of counsel for the

United States is to schedule no more than 2 deposition per month (on average) in any single case.

Given the difficulty of scheduling depositions in August, the current schedule for fact discovery is consistent with the conduct of 8 to 10 depositions by the United States (May, June, July, September, October). This is probably a conservative estimate of the number of depositions needed in this case in light of the fact that the claim filed by the plaintiff, United States Fidelity and Guaranty Company ("Fidelity"), includes alleged damages related to two prime contractors and five subcontractors, in addition to damages suffered directly by Fidelity.

As explained above, in order to meet the current schedule for the production of expert reports, counsel for the parties would be under heavy pressure to complete all written discovery and depositions by the end of April.

Any attempt to complete 8-10 depositions by the United States, and perhaps 8-10 depositions by Fidelity, by the end of April would be onerous. Extra attorneys and staff – who are not familiar with the case – would need to be added on behalf of both parties, and there would be little opportunity for either party to analyze and focus its factual inquiries. Similarly, broad requests for written discovery would need to be served immediately. As a result, much more time and money would be

expended upon discovery than would otherwise be the case, and the discovery achieved by this mad dash would likely be less effective than in the ordinary case.

C. Discovery Efforts To Date

Counsel for the United States filed a notice of appearance on or about September 21, 2006. On or about September 28, 2006, he served the first request for production of documents and the first set of interogatories. During the same week, he reserved funding for an expert, and began the hiring process. He also initiated the process for awarding a contract for litigation support services.

In early October, counsel for the United States initiated inquiries concerning the proper DCAA office to audit the Fidelity claim. Because the answer depends upon the location of the contractor's documents, counsel sent a letter to counsel for Fidelity on October 16, 2006, requesting information about the location of relevant documents.

In early October, counsel for the parties conferred, and agreed to exchange all relevant documents (including the documents of subcontractors, if they could be obtained) in electronic form in certain specified formats. To speed the exchange, counsel agreed to seek to have a "clawback" order entered by the Court that would reduce the need for a careful privilege review of large volumes of documents.

Certain problems arose almost immediately. First, counsel for the United States learned that not all Government documents were gathered in a central location, and that some substantial amount of documents might be duplicates. Second, counsel for the United States subsequently learned that there were far more boxes of documents to copy than he had originally anticipated. The budget for copying services was not sufficient. Furthermore, it appeared that it would be wasteful to copy all the documents located. Third, in November or December, a possibility was raised that some documents might have classified status because of a possible relationship to germ warfare.

Counsel for the United States negotiated with counsel for Fidelity again. It was agreed that the United States would copy nearly all of its own documents (except for certain special categories, such as oversized blueprints), and that the parties would jointly review the 80 boxes of documents in the possession of Ellerbe Becket, a contractor associated with the Government's contract administration efforts. In addition, counsel for Fidelity graciously agreed to wait until the possible problem with classification issues was investigated and resolved.

After a short delay during the Christmas holidays, approximately 40 boxes of the Government's documents were scanned in early January. These documents were produced to Fidelity in electronic form near the end of January. Recently, a few more

documents were located, and will soon be produced to Fidelity.

The parties are scheduled to jointly review the Ellerbe Becket document on February 13, 2007. The United States is bringing an advisor from Texas to participate. It was reasonable to delay the review of Ellerbe Becket documents until after the initial document exchanges by the parties because a central goal of the review is to select only documents not already in our possession. Until the parties exchanged their own documents, there was no practical way to discern what Ellerbe Becket documents were duplicative of documents already gathered.

Fidelity produced approximately 20 boxes of documents in electronic form in January, but certain difficulties have arisen. For example, there have been format issues. The documents are extremely difficult to access in the current format, but Fidelity has promised to help us resolve the issues. Based upon Fidelity's past record of gracious cooperation, we are optimistic that these issues will be resolved.

Upon review of the Fidelity documents produced in January, we learned that the complete files of various subcontractors were not included. This surprised us. We had understood that Fidelity possessed such documents, and would produce them; apparently, there was a good faith misunderstanding. In any event, we anticipate serving subpoenas upon various subcontractors to obtain such documents. We will serve such

subpoenas soon, but, as a practical matter, it is unlikely that all the documents can be collected and copied before the end of March.

In summary, there is a very large volume of documents relevant to this case, and the documents must be collected from a variety of locations. The parties have cooperated in good faith with document collection since the process began in October, but certain misunderstandings, technical issues, financial issues and unavoidable delays (such as the classification issue) have slowed progress.

## CONCLUSION

We respect the Court's desire to keep control of the progress of this case, and we respect the Court's need for information about the case in order to make informed judgments about what schedule is appropriate. Accordingly, we respectfully request that the Court convene a hearing to discuss schedule matters, and to consider our request to move the deadlines for expert reports and expert discovery.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

S/ Steven J. Gillingham
STEVEN J. GILLINGHAM
Assistant Director

S/ James W. Poirier
JAMES W. POIRIER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530
Tele: 202-616-0856
Fax: 202-514-7969

February 1, 2007 Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on February 1, 2007, a copy of the foregoing "DEFENDANT’S UNOPPOSED MOTION FOR A SCHEDULING CONFERENCE" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

S/ James W. Poirier